O. A. Heron, J. D. McDonough and Bituminous Casualty Corp. *v.* Estelle Johnson Girdley.

(*Nashville*, December Term, 1954.)

Opinion filed March 11, 1955.

A. A. KELLY, of South Pittsburg, for plaintiffs in error.

WM. J. TURNBLAZER, of Middlesboro, Ky., for defendants in error.

MR. SPECIAL JUSTICE GRANVILLE S. RIDLEY delivered the opinion of the Court.

William Girdley was employed by the defendants, O. A. Heron and J. D. McDonough, who were d/b/a Heron & McDonough Coal Company in December, 1952. Bituminous Casualty Corporation was its compensation carrier. On May 4, 1953, William Girdley reported for work at the usual time, and approximately an hour and a half later was found dead in the room of the mine where he regularly worked under circumstances hereinafter more fully set out.

On September 23, 1953, his widow filed her petition in the Chancery Court for Sequatchie County seeking compensation and alleging that she and three children, the eldest of whom was fifteen years of age, survived. The defendants answered this petition on March 17, 1954, denying all material allegations, but the only contested issue at the time of the trial and the only issue herein is, whether or not the deceased met his death by an accident arising out of and in the course of his employment as is necessary under Code, Sec. 6852(d). This section of the Code reads as follows:

" 'Injury' and 'personal injury' shall mean only injury by accident arising out of and in the course of employment, and shall not include, disease in any form except as it shall naturally result from the injury."

The case was heard by the Chancellor on oral evidence on April 19, 1954. He found that while working within the course of, and within the scope of his employment the deceased received a fatal injury to his heart as alleged in the petition and awarded compensation as prayed.

The defendant thereupon made a motion for a new trial and upon its being overruled, prayed, was granted, and perfected an appeal to this Court.

The only question here presented for adjudication is whether or not the deceased died from an accident arising out of his employment. The plaintiff in error makes two assignments. The substance of the first assignment of error is that there is no material evidence of probative value to support the Chancellor's findings, and that there is no competent evidence to remove the case made by petitioner beyond the field of speculation and conjecture. The gist of the second assignment of error is, that the Court failed to reconcile and weigh the evidence and judicially determine the weight thereof and the burden of proof of the respective parties. In replying to these assignments, defendant in error insists that there is material evidence of probative value sufficient to shift the burden of proof to the defendant, and that the determination of the preponderance of the evidence was final in the trial Court.

The defendant operated a coal mine and the deceased, William Girdley was employed as a miner by it. The mine consisted of an entry which was apparently a long tunnel into the face of the mountain more than three thousand feet in length. Off of this tunnel were driven rooms. In each of these rooms a single miner worked. The coal was blasted loose from the face or walls of these rooms late on each afternoon, and the next day the miners loaded this coal into cars which were then transported to the entrance of the mine. There was a track laid from the entrance of the mine the entire length of the mine entry. The coal cars, both loaded and empty, on this track were pulled by mules. The defendant, J. D. McDonough drove the mules and pulled the trains of cars both loaded and empty.

Off of this main entry leading into the rooms where the individual miners worked, were also tracks, but the mules did not pull the cars on the tracks leading from the main entry track to the walls or face of the rooms where the coal was loaded into the empty cars.

On the morning of May 4, 1953, William Girdley went to work at the usual time. He rode some two thousand feet to the entrance of the room in which he worked, loaded two cars which were picked up by the mule train operated by the defendant, McDonough, who at the same time left two empty cars. It was the custom for these empty cars to be pushed by the miner over the track in his room to the place in the room where they were loaded. He took the two loaded cars to the main entrance and returned. The defendants, McDonough and Heron were the two persons who first saw the body of the deceased after the accident and the circumstances are best related in their own evidence, portions of which are as follows:

J. D. McDonough testified:

"Q. 79. Now, did you, on your way out, pick up a loaded car at Girdley's opening? A. I picked up two and left him two.

"Q. 80. You picked up two loaded cars and left him two empties? A. That's right.

"Q. 81. And then you hauled the loaded cars on out to the entry? A. That's right.

"Q.82. And brought back the empties? A. Yes, sir.

"Q. 83. When you got back to Girdley's room neck, what did you find there? A. When I got back to the room neck I found one of the empties that I had left him from before setting there and I thought maybe his track might be tore up, I didn't know what was wrong, didn't have any idea of his being dead.

"Q. 84. Is he a fast coal loader? A. He's a good ordinary coal loader, yes, sir. I mean in what you might call fast or slow, he's just a medium worker and I took the car, started to take it up to him to help him and when I got up there I seen him laying across the track. So, when I done that I hollered for Otis, Otis didn't hear me and I come back at the room neck and hollered and told him something was wrong with Bill. At the time I didn't know he was dead but we both got back in there and he was dead.

"Q. 85. And you find him. How was he lying on the track? A. He was lying across the track on his face.

"Q. 86. On his face. Was there a coal car close to him? A. No, he had, looked like he had fell across the track and had rolled about as far as from here to the wall on from him.

"Q. 87. You found him just—just what you saw then? A. That's right.

"Q. 88. He was lying with his face on the track? A. Yes, sir.

"Q. 89. And there was an empty coal car back at the neck of the mine? A. That's right.

"Q. 90. He never had brought it in? A. Never had brought it in.

"Q. 91. Out in front of him a distance from where you are sitting to the wall back there? A. Something like that, maybe halfway from here to the wall.

"Q. 92. What distance would you say it is from there? A. Oh, I'd say roughly fifteen or twenty feet.

"Q. 93. About fifteen or twenty feet ahead of where he was laying there was an empty coal car sitting on the track? A. That's right."

Continuing on cross-examination McDonough said:

"X. 44. Isn't that just what happened, he was in there about forty-five or fifty feet? A. Do what?

"X. 45. Wasn't that what happened, he was found in there forty-five or fifty feet? A, Well, I believe he was in a little farther than that. Did you say forty-five or fifty?

"X. 46. Yes. A. Well, approximately that.

"X. 47. Now, J. D., how did you find Mr. Girdley there that morning? A. He was laying on his face across the track.

"X. 48. And you had dropped him off some cars, one car was ahead of him and that car was on its way to the face of the coal? A. That's right.

"X. 49. The other car was behind him? A. That's right.

"X. 50. And he was pushing the car that was ahead of him? A. That's right.

"X. 51. Towards the face? A. Yes, sir.

"X. 52. And you found him there at his normal working place? A. That's right.

"X. 53. That was the place that you and your partner had assigned him to work? A. That's right.

"X. 54. And I believe you stated he already loaded two cars that morning? A. Two cars."
On redirect examination McDonough said:

"R.D. 4. You were asked on cross examination if Mr. Girdley wasn't pushing a car ahead of him. You don't know what he was doing exactly? A. Well, when I left—

"R.D. 5. (Interposing) All you know is that you just saw a car about twenty feet ahead of him? A. That's right.

"RD. 6. He was lying on his face on the ground?
A. That's right."

The Court also questioned this witness and under the questioning of the Court he testified as follows:

"The Court: And he had worked off from 200 and odd feet from the entry?

"The Witness: Yes, sir.

"The Court: That is, his coal was faced up some 225 feet from the entry?

"The Witness: Yes, sir.

"The Court: How far back in there did you find him on the tracks dead?

"The Witness: Well, I'd say fifty to sixty feet. I didn't measure it, something like that, maybe seventy-five.

"The Court: Off of the entry or from the face of the coal?

"The Witness: Off of the entry.

"The Court: And his car was between him and the face of the coal?

"The Witness: One of them was sitting—say I found him right here, one of them he had been pushing, I presume.

"The Court: From the position he was lying on the tracks, was his head, in other words, facing toward the face of the coal or the direction his car was going in or the opposite way?

"The Witness: This is the track here and he was laying this way, in other words, I'd say at a 45-degree angle.

"The Court: All right."

The defendant, O. A. Heron was also questioned by

the Court and testified in regard to the track in the deceased Girdley's room as follows:

"The Court: This room where this man was working, how is the floor of that room or what I'd call terrain outside, in other words, is it uphill, downhill, level, or what sort of condition do you find in there where the track is laid and where he would be pushing his mining cars up to the face of the coal?

"The Witness: Well, it's a little off of the entry. I'd say fifty feet, a little hard push, too hard to push two cars, when you only got two cars you push one over the knuckle and come back and get the other and take two on to the facing.

"The Court: What I'm trying to get at, in taking his car from where it was left there on the siding back to the face of the coal, would he have had to push or exert himself to push that car along there at that point?

"The Witness: He would, had to push some, it wasn't no strain for me.

"The Court: You mean it was such a grade he couldn't have pushed two cars?

"The Witness: Couldn't have pushed two cars.

"The Court: What is the weight of one of those mining cars, do you know?

"The Witness: No, I don't.

"The Court: All right.

"RX. 1. When the men couldn't push these cars in the rooms was it the general practice of the drivers to help them? A. Yes, sir.

"RX. 2. And usually how was it, would he take a run at pushing over this knuckle you spoke of? A. No, sir.

"RX. 3. Would he prize his back up against the top and push backward? A. (Witness moves head from side to side)

Mr. Kelly: Speak out so the reporter can get it.

"A. I wouldn't myself, I would take one hand and push a car over this knuckle, didn't have to push over fifty feet until it was practically level.

"RX. 4. But you couldn't push two cars? A. You couldn't push two."

It was from 200 to 250 feet from the entrance to the room where deceased was working to the place where he would have to load his cars. He would have to push one empty car over the knuckle or hump described by Heron when it would reach a level place, and then he would have to return and get the other empty car and push it over this knuckle or hump when he could then push both cars to the proper position.

The plaintiff in error discussed at some length the conflict between the evidence of the plaintiff and her lay witness, Turner, who said that the deceased was an able-bodied, strong and healthy physical human being, whereas, her expert witness, Dr. R. E. Standefer testified that he examined the deceased on March 28, 1953, at which time he was in "just pretty fair condition. I don't usually make much notations, you know, when they come in that way, but he was in pretty fair condition, his blood pressure was down and his heart was going fairly regular and his arteries showed up to be a little hard and his kidneys was disturbed a little at that time, a little pus present, and, that's just about the notations I have on him."

Because Dr. Standefer was the only expert witness introduced it is important to quote from his evidence which is as follows:

"Q. 19. Was he ever afflicted with high blood pressure, Doctor? A. Afflicted with high blood pressure?

"Q. 20. Yes. A. Yes, sir. His blood pressure would shoot up to 170 and 80 and then on treatment it would drop back down to 150 or 60 and even 40.

"Q. 21. Now, Doctor, what, in your opinion, was the cause of his death? A. What was the cause of his death?

"Q. 22. Yes. A. I put on his death certificate myocarditis, that is the general chronic form, inflammation of the heart, the heart was enlarged. I didn't put that on his death certificate. I put myocarditis, hypertension and arteriosclerosis or hardening of the arteries.

"Q. 23. Now, Doctor, I will ask you if the performance of hard manual labor, such as working in a coal mine loading coal or pushing mine cars would tend to aggravate or accelerate high blood pressure? A. It certainly would.

"Q. 24. Would that performing of hard manual labor tend to also increase the myocarditis you speak of? A. It would predispose or might be the direct cause of a fatal condition as a result of having myocarditis.

"Q. 25. Now, Doctor, would the effect of foul air, or what is commonly termed bad air, affect a man who had high blood pressure or that condition that you spoke of here? A. That would be a pronounced effect, bad air, he went into it against the advice not only of myself, stay out of bad air, stay out of bad air, with the diseased condition of his heart that it might be fatal. I told him, I told Ed Girdley that.

"Q. 26. Now, Doctor, in your opinion would the effect of what is known as bad air and the effect of straining or performing hard manual labor aggravate or accelerate the condition which Mr. Girdley had? A. It would aggravate and accelerate, both."

There is no irreconcilable conflict between the evidence of petitioner and her lay witness, Turner, as to the physical condition of the deceased, and that of her expert witness, Dr. Standefer. The lay witness of necessity bases his opinion of his being an able-bodied, strong and healthy human being upon his observation, and upon statements which the deceased had made to him. No myocarditis, high blood pressure, or hypertension would be apparent to a lay individual unless in extreme forms. Dr. Standefer's evidence as set out in his statement first above quoted would indicate no such extreme condition.

However, the physical condition of the deceased would not be a deciding factor. The employer takes the employee in the condition in which he is employed and assumes the risk of having this weakened condition aggravated or accelerated by his employment. *Swift & Co.* v. *Howard,* 186 Tenn. 584, 212 S. W. (2d) 388; *Lay* v. *Blue Diamond Coal Co.,* Tenn. 1954, S. W. (2d) 223.

That accidental death within the meaning of the Compensation Law is provable by circumstantial evidence just as any other fact has not been seriously questioned since the decision in *Riley* v. *Knoxville Iron Company,* 178 Tenn. 107, 156 S. W. 2d 398.

It is true as argued by plaintiff in error that the burden is upon the claimant to prove its case in all its parts by a preponderance of the evidence. *Milstead* v. *Kaylor,* 186 Tenn. 642, 212 S. W. (2d) 610.

■ It is also true that finding a person dead at his post of duty itself does not alone raise a prima facie case. *Home Ice Co.* v. *Franzini,* 161 Tenn. 195, 32 S. W. (2d) 1032; *Farris* v. *Yellow Cab Co.,* 189 Tenn. 46, 222 S. W. (2d) 187.

■ Even though the deceased died of myocarditis, high blood pressure and hypertension, if the physical exertion was a contributing and accelerating factor a compensable case is made. *Patterson Transfer Co.* v. *Lewis,* 195 Tenn. 474, 260 S. W. (2d) 182; *Lay* v. *Blue Diamond Coal Co.,* Tenn., 264 S. W. (2d) 223; *Cunningham* v. *Hembree,* 195 Tenn. 107, 257 S. W. (2d) 12.

■ When the Court's findings are based upon expert opinion it is not speculative or conjecture to find that the proven exertion was a contributing or an accelerating factor. *Patterson Transfer Co.* v. *Lewis,* supra; *Lay* v. *Blue Diamond Coal Co.,* supra; *Boyd* v. *Young,* 193 Tenn. 272, 246 S. W. (2d) 10.

■ Where the deceased is found dead at his post of duty and manual labor or physical exertion is proven a prima facie case may, under the circumstances of each case, be made out that death was due to an accident arising out of, and in the course of the employment of the deceased. *Cunningham* v. *Hembree,* supra; *Patterson Transfer Co.* v. *Lewis,* supra; *Milstead* v. *Kaylor,* supra.

There was no eyewitness to the death of William Girdley, but the circumstances seem clearly to prove that he pushed one empty car over the knuckle or hump between the entry to his room and the place of loading; that he then either rolled or staggered the five or six steps to the point where his body was found, or that the car itself rolled five or six steps after he fell. From the evidence of Dr. Standefer the exertion required to push this car over

the knuckle or hump was a contributing and accelerating factor.

Although the foregoing is sufficient for an affirmation of the judgment of the lower Court in this cause, the Chancellor also found that there were air openings or vents on only one side of the room in which the deceased was working; that the air at the dead end of the mine entry circulated at the rate of only three thousand cubic feet per time unit, when it should have circulated at that point at the rate of six thousand cubic feet per time unit; that because of this, the air at the time of the accident was "tight" or "bad"; that it was not up to government specifications. There is ample undisputed evidence in the record to sustain these findings of the Chancellor.

Dr. Standefer testified that such "tight" or "bad" air would also be a contributing or accelerating cause of death from myocarditis.

From this circumstance and from the other circumstances surrounding the death of William Girdley the most reasonable inference is that his death was contributed to by the physical exertion required by his work on that morning and by the conditions in which he was working.

The judgment of the Chancellor is affirmed at the cost of plaintiffs in error.